**NOT FOR PUBLICATION**

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ICAP CORPORATES, LLC, | Civil Action No. 14-5451 (JLL) (JAD) |
| Petitioner, | **REPORT AND** |
| v. | **RECOMMENDATION** |
| MICHAEL DRENNAN, | |
| Respondent. | |

**JOSEPH A. DICKSON, U.S.M.J.**

This matter comes before the Court upon Petitioner ICAP Corporates, LLC's ("ICAP") Petition and Motion to Vacate the National Futures Association's Arbitration Award, (ECF Nos. 1, 2), and Respondent Michael Drennan's ("Drennan") Cross Motion to Confirm the Arbitration Award. (ECF No. 7). Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the Court did not hear oral argument on either application. Upon careful consideration of the parties' submissions, and for the reasons stated below, this Court respectfully recommends that ICAP's Motion to Vacate the Arbitration Award, (ECF No. 2), be **GRANTED** and Drennan's Cross Motion to Confirm the Arbitration Award, (ECF No. 7), be **DENIED.**

### I.    BACKGROUND

The arbitration at issue was initiated by Drennan after he was placed on garden leave at full salary following his resignation from ICAP. (Amalfe Cert., Ex. D, ECF No. 2-5, ¶ 2); (Amalfe Cert., Ex. G, ECF No. 2-5, at 65, ¶¶ 9-10). The dispute generally concerns what amount, if any, ICAP owed Drennan pursuant to § 3.4 of his Employment Agreement. (Amalfe Cert., Ex. E, ECF

No. 2-5, at 39, § 3.4).[1] Drennan's Employment Agreement contained a clause subjecting certain claims to arbitration before the National Futures Association ("NFA") in New York "in accordance with its then-existing rules." (Id. at 46, § 16.3). Drennan filed a "Statement of Claim" with the NFA on September 17, 2013. (Amalfe Cert., Ex. I, ECF No. 2-5, at 71). He later revised his "Statement of Claim" on October 1, 2013 claiming: (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) *quantum meruit*/unjust enrichment; (4) promissory estoppel. (Amalfe Cert., Ex. D, ECF No. 2-5, at 1-35).

The NFA appointed Charles Nastro, Alice Oshins, and Ernest Badway as arbitrators to hear Drennan's claim and scheduled the arbitration to take place over the course of four (4) days. (Amalfe Cert., Ex. J, ECF No. 2-6, at 2; Amalfe Cert., Ex. K, ECF No. 2-6, at 5). The parties submitted a Joint Hearing Plan to the NFA one month before the Hearing, setting forth, among other things, a list of witnesses and potential exhibits. (Amalfe Cert., Ex. G, ECF No. 2-5). ICAP listed seven (7) witnesses to be called during the course of the proceedings, Sep Alavi, Jennifer Blaza, James P. Flynn, Esq., Richard Kaltenbach, Esq., Bill Naphin, Gary Pettit, and Gary Smith. (Id. at 59). Mr. Smith, Deputy CEO of ICAP's Global Broking Business, Mr. Pettit, ICAP's Executive Managing Director of Global Financial Futures and Options, and Ms. Blaza, ICAP's Finance Business Partner, were based out of ICAP's London offices. (Amalfe Cert., ECF No. 1-2, ¶¶ 7-10). "ICAP coordinated with Msgrs. [sic] Smith and Pettit and Ms. Blaza to fly from London to New York City to arrive on Thursday, May 1, 2014, in anticipation for their testimony on Friday, May 2, 2014." (Id. ¶ 11) (emphasis removed). Drennan listed two witnesses, himself and Caroline Arnold. (Amalfe Cert., Ex. G, ECF No. 2-5, at 59). "A week before the hearing

---

[1] § 3.4 of Drennan's Employment Agreement states, "[t]he Company and the Employee agree to engage in good faith discussions at or around the first anniversary of the Start Date to negotiate the terms of Employee's prospective bonus compensation for the second year of the term."

Drennan's counsel advised ICAP's counsel that Drennan would not be calling Ms. Arnold." (Resp. Br., ECF No. 7-5, at 5, ¶ 11).

Prior to the commencement of the hearing, ICAP filed a Motion for Partial Summary Judgment on Drennan's claims for *Quantum Meruit/*Unjust Enrichment and Promissory Estoppel. (Amalfe Cert., Ex. N, ECF No. 2-6). The hearing began on April 29, 2014. ICAP's counsel "raised with the Panel [her] prior request for additional hearing days beyond the four hearing days already scheduled" because of her "belief that four hearing days might not be sufficient for a full presentation of the case." (Amalfe Cert., ECF No. 1-2, ¶¶ 14, 16). The Panel denied ICAP's request and instructed that the case proceed as scheduled. (Id. ¶ 16). That same morning, ICAP's counsel reminded the Panel about the pending motion for summary judgment, after which "the Panel excused itself for a few minutes and then advised that the motion for partial summary judgment was denied," providing no oral or written basis for its decision. (Id. ¶ 19).

ICAP asserts that during the course of the Hearing, "the Panel either ignored or overruled the majority of [its] objections and significantly restricted [its] cross-examination of Drennan." (Id. ¶ 20). ICAP further asserts that "[o]f the approximately 18 objections [it] made during Drennan's direct examination, the Panel either overruled or did not respond to the objection 15 times." (Id.) (emphasis removed). ICAP's counsel further certifies that the Panel instructed her to "move on," and stated that it had "already heard" testimony, "or otherwise impeded [her] ability to elicit evidence 65 times, 37 of which were during [her] cross-examination of Drennan. In contrast, during Drennan's case-in-chief, the Panel interrupted Drennan's counsel, suggesting he move on, a total of only 4 times, and never interrupted him in the same manner during his cross-examination of any ICAP witnesses." (Id. ¶ 21).

3

At approximately 9:30 a.m. on the second day of the Hearing, the Panel requested that ICAP prepare certain financial data in order to provide the Panel with clarity on the financial issues presented. (Id. ¶ 25). ICAP provided the requested documentation on the morning of the third day, prior to Drennan resting his case. (Id. ¶ 32). ICAP asserts that although "Drennan contended that there were errors and omissions and that the data compiled should not be relied upon, suggesting that ICAP had misled the [P]anel with its submission[,] ICAP had no ability to rebut or otherwise challenge Drennan's position." (Pet. Br., ECF No. 2-1, at 19).

On the second day of the Hearing at approximately 1:30 p.m., prior to the completion of Drennan's cross-examination, the Panel requested an offer of proof from ICAP as to all but one of the witnesses it intended to call during its case-in-chief. (Amalfe Cert., ECF No. 1-2, ¶¶ 33, 34; Amalfe Cert., Ex. B, ECF No. 2-3, 489:4-7). This request appears to have been made without forewarning, and ICAP's counsel "was not prepared to present a complete proffer as to each of the witnesses ICAP intended to call, as [she] was in the middle of cross examination and did not have [her] notes or examination outlines for all of those witnesses in the hearing room and available for [her] to refer to." (Amalfe Cert., ECF No. 1-2, ¶ 34). Additionally, "[t]he Panel did not afford [ICAP's counsel] the opportunity to make the proffer after [she] was able to obtain notes and outlines." (Id.).

MS. AMALFE: . . . I don't have [Ms. Blaza's] outline in front of me

. . .

MS. AMALFE: Mr. Nastro, I don't have [Ms. Blaza's] entire outline in front of me right now. If you want me tomorrow morning to make an offer of proof, I will.

CHAIRMAN NASTRO: No.

MS. AMALFE: I can't do it right now on every topic.

. . .

MS. AMALFE: Well, I haven't made complete proffers because I don't have their outlines. I told you I would do that in the morning. I have, as I said, Mr. [Nastro]. These all have been identified as people who have knowledge of the relevant facts.

. . .

MS. AMALFE: But I don't have their outlines here with all the issues. I didn't bring them today.

(Amalfe Cert., Ex. B, ECF No. 2-3, 490:5-6; 492:2-6; 519:17-22; 526:24-527:1).  Despite the fact

that ICAP was unprepared to present the information on the spot, the Panel denied her request for

additional time to prepare and present a complete proffer for each witness.  (Amalfe Cert., ECF

No. 1-2, ¶¶ 34, 35).  Nevertheless, ICAP supplied the Panel with the information it did have

regarding each witness. (Amalfe Cert., Ex. B, ECF No. 2-3, 488:21-535:2).  Following the proffer,

the Panel precluded two of ICAP's witnesses, brokers Sep Alavi and Bill Naphin, from testifying

entirely, explaining that these witnesses were not necessary to the "management issue" at hand.

(Amalfe Cert., ECF No. 1-2, ¶ 38; Amalfe Cert., Ex. B, ECF No. 2-3, 533:13-21).  The Panel also

limited the testimony of ICAP witnesses Ms. Blaza and Mr. Kaltenbach.  (Amalfe Cert., ECF No.

1-2, ¶ 41).  The Panel, therefore, precluded or limited testimony from four (4) of ICAP's seven (7)

witnesses.

On the third day of the Hearing, at approximately 9:15 a.m., the Panel announced, prior to

ICAP completing its cross-examination of Drennan, the Hearing would conclude that same day.

(Id. ¶ 48).  ICAP completed its cross-examination shortly before 11:00 a.m. and began its case-in-

chief at approximately 11:30 a.m.  (Id. ¶ 50; Supp. Amalfe Cert., ECF No. 8-1, ¶ 5).  The hearing

proceeded without a dinner break and the Panel reiterated that there was "very limited time" and

ICAP's counsel should "move on" or was given similar instruction "a total of 18 times during

ICAP's limited case-in-chief." (Amalfe Cert., ECF No. 1-2, ¶¶ 51, 64; Amalfe Cert., Ex. B, ECF No. 2-3, 9:13:20-21, 1023:22) (emphasis removed).

At the insistence of the Panel, Mr. Smith, whose plane arrived from the United Kingdom at approximately 1:00 p.m. EST, arrived at the Hearing at approximately 4:30 p.m. EST. (Amalfe Cert., ECF No. 1-2, ¶¶ 52-56). Mr. Smith began his testimony at approximately 6:00 p.m. EST ("11:00 p.m. GMT in his time zone"), meaning "Mr. Smith had been awake for approximately 25 hours at the time he was compelled to testify." (Id. ¶¶ 56-57). Following Mr. Smith's testimony, ICAP began its examination of Mr. Kaltenbach at approximately 8:05 p.m. and concluded at roughly 8:30 p.m. (Id. ¶ 59).

ICAP further emphasizes that the Panel continued to engage in behavior that demonstrated a lack of interest in the proceedings. During Mr. Pettit's testimony, Aribtrator Oshins "took a personal phone call" without requesting a recess or "asking counsel to stop examination of the witness." (Id. ¶ 60). Arbitrator Oshins also "placed her head down on her arms on the table in a resting position as if she were about to take a nap." (Id. ¶ 62). ICAP's counsel also certifies that "Arbitrator Badway spent the majority of ICAP's case-in-chief reading his iPad and otherwise appearing disengaged." (Id. ¶ 63). Additionally, the Panel "routinely had discussions with counsel 'off the record' throughout the Hearing. During many of these 'off the record' periods, the Panel took the opportunity to demand information from ICAP and to chastise, pressure, and scold ICAP's counsel." (Id. ¶ 22).

After both parties submitted a "Closing Argument" brief on June 9, 2014, the NFA informed the parties that the Panel closed the record. (Amalfe Cert., ECF No. 2-8, Ex. U; Amalfe Cert., ECF No. 2-9, Ex. V; Amalfe Cert., ECF No. 2-10, Ex. X, at 3-5). The Panel ultimately

awarded Drennan compensatory damages of $850,000.00 and other costs of $10,150.00 for a total award of $860,150.00. (Amalfe Cert., ECF No. 2-10, Ex. AA, at 21).

## II.   LEGAL STANDARD

There exists a "strong presumption in favor of arbitration" and a court may vacate "only under exceedingly narrow circumstances." Int'l Bhd. of Teamsters, Local 701 v. CBF Trucking, Inc., 440 F. App'x. 76, 77 (3d Cir. 2011) (internal citation omitted).  Section 10(a) of the Federal Arbitration Act, 9 U.S.C. § 1, et seq., ("FAA") provides that a Court may vacate an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrator, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.  ICAP argues that the Court should vacate the Panel's award pursuant to 9 U.S.C. § 10(a)(3) and (4).[2]  (Pet. Br., ECF No. 2-1, at 22).[3]

---

[2] As noted below, the Court need not consider whether or not the Panel's award should be vacated pursuant to 9 U.S.C. § 10(a)(4) as a result of this Court's determination under 9 U.S.C. § 10(a)(3).
[3] The authority to vacate an arbitration award is almost exclusively limited to the grounds set forth in 9 U.S.C. § 10(a)(1)-(4).  In addition to those bases, however, "the Third Circuit has recognized certain common law grounds for vacating an arbitration award." TQM Constr. Co. v. New Jersey Bldg. Const. Laborers Dist. Council, Local 394, No. 11-831 (JLL), 2011 WL 1327501, at *3-4 (D.N.J. Apr. 4, 2011) opinion clarified on denial of reconsideration, No. 11-831 (JLL), 2011 WL 2446571 (D.N.J. June 15, 2011).  These grounds include: 1) vacting an award if it is "completely irrational." see TQM Constr., No. 11-831 (JLL), 2011 WL 1327501, at *3 ("In order to vacate an arbitration award on such grounds, there must be absolutely nothing in the record to justify the arbitrator's decision") (internal citation omitted); 2) courts may deny enforcement of an arbitration

### a.  9 U.S.C. § 10(a)(3)

Section 10(a)(3) of the FAA provides, in pertinent part that a Court may vacate an arbitration award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3).  The arbitrator's error, however, "must be one that is not simply an error of law, but which so affects the rights of a party that . . . he was deprived of a fair hearing." New Jersey Bldg. Laborers Dist. Councils Local 325, Liuna v. Molfetta Indus. Co., 365 F. App'x 347, 350 (3d Cir. 2010) (quoting Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3d Cir. 1968)).

ICAP argues that the Panel deprived it of a fundamentally fair hearing in the following ways:

> First, the Panel precluded ICAP from calling two key witnesses whose testimony was pertinent and material to the controversy and necessary to rebut the testimony of Drennan.  Second, the Panel significantly restricted and limited ICAP in its direct examination of two other, key witnesses.  Third, the Panel precluded ICAP from fully cross-examining Drennan.  Fourth, the Panel severely limited the time within which ICAP could present its case and repeatedly stated that time was short and urged counsel to move along quickly.  Fifth, without justification or reason, on the third day of the hearing and just as ICAP was getting the chance to present its own case- in-chief, the Panel canceled a pre-scheduled fourth day of the Hearing.

---

award if there is "absolutely no support at all in the record justifying the arbitrator's determinations." News Am. Publs., Inc. Daily Racing Form Div. v. Newark Typographical Union, Local 103, 918 F.2d 21, 24 (3d Cir. 1990); 3) a court may also vacate an arbitration award if the arbitrator exhibits a manifest disregard for the law.  Sherrock Bros. v. Daimler Chrysler Motors Co. LLC, 260 F. App'x 497, 499 (3d Cir. 2008) (internal citations and quotations omitted) (in order to constitute a manifest disregard for the law, "the decision must fly in the face of clearly established legal precedent, such as where an arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it"); and 4) "[L]astly, arbitration awards may be vacated if they violate clearly defined and dominant public policy as 'ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" TQM Constr., No. 11-831 (JLL), 2011 WL 1327501, at *4 (quoting Eastern Associated Coal Corp. v. United Mine Workers of America, 531 U.S. 57, 62–63 (2000)). ICAP has not, however, raised these common law grounds before the Court.

(Pet. Br., ECF No. 2-1, at 23).

While the crux of ICAP's argument appears to be the Panel's failure to consider evidence, the Third Circuit has declined to vacate arbitration awards even in certain circumstances where the arbitrators excluded evidence. See e.g., Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 559-60 (3d Cir. 2009) (concluding that "the District Court properly denied Century's motion to vacate the arbitration award under 9 U.S.C. § 10(a)(3)" because the "arbitrators' decision to exclude evidence Century proffered based on the evidence's irrelevance was well within their authority in conducting the arbitration") (emphasis added). Section 10(a)(3) cannot be read "to intend that every failure to receive relevant evidence constitutes misconduct which will require the vacation of an arbitrator's award." Newark Stereotypers' Union No. 18, 397 F.2d at 599 (emphasis added). "After all, even district courts sometimes reject evidence that they should admit and yet such erroneous rulings hardly can be characterized as 'misconduct.'" Century Indem. Co., 584 F.3d at 557. Vacatur under Section 10(a)(3) is warranted only where "the arbitrator's refusal to hear proffered testimony 'so affects the rights of a party that it may be said that he was deprived of a fair hearing.'" Teamsters Local 312 v. Matlack, Inc., 118 F.3d 985, 995 (3d Cir. 1997) (quoting Newark Stereotypers' Union No. 18, 397 F.2d at 599); see also Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 481 F.3d 813, 818 (D.C. Cir. 2007) ("Every failure of an arbitrator to receive relevant evidence does not constitute misconduct requiring vacatur of an arbitrator's award[;] a federal court may vacate an award only if the panel's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings.") (internal citations and quotations omitted).

It is clear that courts are reluctant to vacate arbitration awards, even when a party has been denied the opportunity to present certain evidence, particularly when that evidence is of

9

questionable relevance or duplicative in nature. See Century Indem. Co., 584 F.3d at 558 ("[I]nasmuch as arbitrators have wide latitude in how they conduct proceedings, it is well within an arbitrator's authority to refuse to hear evidence that is of little relevance.") (internal citation and quotations omitted) (emphasis added); see also Transtech Indus. v. A&Z Septic Clean, 270 F. App'x 200, 209 (3d Cir. 2008) (refusing to vacate arbitration award where the arbitration "proceedings lacked certain pertinent evidence, a live hearing, and cross-examination of witnesses" where the "multiple submissions, voluminous supporting materials, and frequent opportunities for oral argument" suggested that no defect in due process existed); see also Graphic Communs. Conf., Int'l Bhd. of Teamsters, Local 612M v. Nextwave Web, LLC, No. 11-02342 (CCC), 2012 WL 426274, at *4 (D.N.J. Feb. 8, 2012) ("Respondent generally asserts that it was not given every opportunity to present evidence or to conduct adequate cross-examination of witnesses, but does not point to any specific examples.").

When a party establishes that the arbitrators have refused to consider relevant evidence, however, courts are more likely to vacate an award. See Konkar Mar. Enters., S.A. v. Compagnie Belge D'Affretement, 668 F. Supp. 267, 271 (S.D.N.Y. 1987) (finding that parties to an arbitration "must be allowed to present evidence without unreasonable restriction . . . and must be allowed to confront and cross-examine witnesses. . . . Where a party to an arbitration does not receive a full and fair hearing on the merits, a district court will not hesitate to vacate the award") (internal citation omitted).

## III.   DISCUSSION

### a.   Canceling the Fourth Day of the Hearing

Despite having originally scheduled a four day Hearing, the Panel informed the parties on the morning of the third day, before Drennan had completed his case-in-chief, that the arbitration

10

would conclude that same day. (Amalfe Cert., ECF No. 1-2, at 18, ¶ 48). Drennan's case-in-chief took nearly two full days and the morning of the third and final day, with Drennan being the only witness. (Id.; Resp. Br., ECF No. 7-5, at 5, ¶ 11). ICAP began cross-examining Drennan at approximately 11:00 a.m. on the second day of the Hearing and concluded around the same time on the third day. (Supp. Amalfe Cert., ECF No. 8-1, ¶¶ 4, 5). However, ICAP notes that "when the approximately 45-minute lunch break on Day 2 and the 1 hour when [ICAP] was forced to provide a proffer is [sic] removed from the equation, [ICAP] completed [its] cross-examination of Drennan in approximately 5 hours and 45 minutes." (Id. ¶ 5).

ICAP began to present its case-in-chief at approximately 11:30 a.m. on the third and final day of the hearing. (Amalfe Cert., ECF No. 1-2, at 18, ¶¶ 48, 50). The Panel then precluded ICAP from presenting "evidence pertinent and material to the controversy" and also significantly truncated ICAP's time to present its other evidence. The Court finds that the Panel's conduct resulted in precisely the sort of prejudice required to justify vacatur under 9 U.S.C. § 10(a)(3). The process by which the Panel determined to exclude or limit testimony from ICAP's witnesses and to cancel the pre-scheduled fourth day of the hearing leaves the clear impression that the Panel had every intention of limiting the proceeding to three days from the outset, before it had a chance to properly consider ICAP's evidence. While ICAP's counsel sought to make the proffer requested of her, the Panel also questioned her regarding the order she intended to present the witnesses and specifically why key witnesses would not be available until the fourth day of the Hearing.

MR. BADWAY: Why can't you have Mr. Pettit and Mr. Smith tomorrow?

MS. OSHINS: Tomorrow.

MS. AMALFE: They're not here. I don't have them here.

MS. OSHINS: You don't have them here?

MR. BADWAY: When are they coming when --

MS. AMALFE: They're coming when – he didn't even close his case. They're in the UK. They will come when they're ready to be heard.

MS. OSHINS: They're in the UK. This case has two more days and we're done.

MS. AMALFE: And they will come. We can't be done in two days. I have the right to put on my case. I also have the right to put on my witnesses as I see the order.

CHAIRMAN NASTRO: And I have the right to stay to midnight tomorrow night if I want to.

MS. AMALFE: Then I will bring them from the UK.

MS. OSHINS: No, no, tomorrow.

MS. AMALFE: Mr. Pettit will be here ready to testify Friday morning.

MR. BADWAY: No, call him now.

MS. OSHINS: No, tomorrow.

MS. AMALFE: That's not right.

MR. BADWAY: It is right.

MS. OSHINS: Yes.

MS. AMALFE: Why can't I put my brokers on? I don't have a broker on Friday.

MR. BADWAY: Counsel, when you enter into an arbitration and you're scheduled for a hearing, all of your witnesses must be ready.

MS. AMALFE: They're all ready.

MS. OSHINS: Then Get [sic] them here.

MR. BADWAY: But they need to be here.

. . .

MS. OSHINS: We think that your most important witness is Mr. Pettit.

MS. AMALFE: And he will be here.

MS. OSHINS: That's who we'd like to hear from first.

MS. AMALFE: Yeah, I don't -- he will be here. He's slated for Friday morning.

CHAIRMAN NASTRO: He shouldn't have been. He needs to be here tomorrow.

MS. AMALFE: Well, I don't know if I can get him tomorrow. He's not here.

MR. BADWAY: Have one of your colleagues go do it.

MS. AMALFE: Well, they're already six hours ahead.

MR. BADWAY: Yeah, it's 7:00 there, 6:30.

MS. AMALFE: Well, you got to get on a plane and fly here and get here. I don't think that's fair, Mr. Badway. I mean --

MR. BADWAY: Ms. Amalfe, I have to be candid with you, okay, We've allotted four days for this. Okay? Your witnesses should have all been here, especially when they're traveling, so I have to tell you, what's not fair is your putting us in this position

. . .

MR. BADWAY: But counsel, I have to tell you, we're at a point where he's your witness. He's your main witness, Mr. Pettit. The idea that he wasn't going to be the first person you called, which to me would have meant Thursday at the latest, okay, Thursday at the latest, is just -- I just can't comprehend it. I really can't.

. . .

MS. AMALFE: I don't think we need to fight about Mr. Pettit. He's going to be here.

MR. BADWAY: But Friday. Why not tomorrow?

MS. AMALFE: I can try to get him here tomorrow.

(Amalfe Cert., Ex. B, ECF No. 2-3, 502:5-503:18, 513:1-514:1, 515:3-9, 515:18-23).[4]  Notably,

the transcript reveals that on the second day of the hearing, the Panel was pressing ICAP's counsel

---

[4] "Given the important business roles Msgrs. [sic] Smith and Pettit and Ms. Blaza fulfill, and taking into account when ICAP anticipated reaching these witnesses during the Hearing . . .   ICAP coordinated with Msgrs. [sic] Smith and Pettit and Ms. Blaza to fly from London to New York

to have a key witness available on day three, instead of day four. One question clearly before the Court, therefore, is whether a party can be said to have had a fundamentally fair hearing when the Panel and the parties agree to a four day Hearing and then, after the arbitration has begun, and after the defense has put its strategy into motion, the Panel cuts the Hearing to three days on the morning of the third day, requiring one of the defense's main witnesses to testify after lengthy travel and with little or no sleep, and precluding the testimony of other witnesses that the party asserts is necessary to rebut key testimony?

Drennan argues that "the Panel advised the parties to be ready to proceed with all documents and witnesses available on the first day of the hearing, stating that the parties had to appear 'with [their] witnesses and be prepared to present [their] evidence". (Resp. Br., ECF No. 7-5, at 8, ¶ 12c). Specifically, Drennan cites to a letter sent from the NFA to the parties, which states, in relevant part, "[p]lease attend promptly with your witnesses and be prepared to present your evidence. The Arbitrators have arranged their schedules to hear this matter so it is important for everyone to appear on the date scheduled." (Amalfe Cert., Ex. K, ECF No. 2-6, at 5). This does not, however, resolve the question. The NFA did <u>not</u>, as Drennan states, require that all documents and witnesses be available on the <u>first day</u>, but rather be prepared to present the evidence and witnesses "on the date scheduled." In that same letter, the NFA informed the parties that it had scheduled the Hearing to last for four days. The record reflects that ICAP was prepared to present its evidence and witnesses "on the date scheduled" and that the Panel altered that schedule, to ICAP's detriment, mid-hearing.[5] In essence, the Panel set the rules of the game and

---

City to arrive on Thursday, May 1, 2014, in anticipation for their testimony on **Friday, May 2, 2014**." (Amalfe Cert., ECF No. 1-2, ¶ 11) (emphasis in original).

[5] Drennan also states that the parties attended a scheduling conference with the Panel on February 13, 2014 during which "the parties and the Panel discussed the necessary and likely length of the hearing. Drennan sought a hearing of no more than two days, and ICAP suggested that at least

then, midway through the third quarter, and without prior notice, it changed them, canceling the fourth.

As a result of limiting the Hearing to three days, several of ICAP's witnesses were required to appear on the third day and present their testimony in a truncated time frame. As noted above, Mr. Smith was required to testify for about two hours on the third day of the Hearing, the same day he arrived from the United Kingdom, after having "been awake for approximately 25 hours at the time he was compelled to testify." (Amalfe Cert., ECF No. 1-2, ¶¶ 56, 57, 58). For reasons described below, the arbitrators' decision to abruptly cancel the fourth scheduled hearing day deprived ICAP of its right to present its evidence, resulting in a fundamentally unfair Hearing in violation of 9 U.S.C. § 10.

### b. <u>The Panel's Refusal to Hear Relevant Evidence</u>

ICAP argues that the Panel refused to hear evidence "that was not only pertinent and material, but highly critical to ICAP's entire defense of the case." (Pet. Br., ECF No. 2-1, at 25). As a result, ICAP claims that the Panel "severely impeded" its opportunity to present its defenses. (Id.). ICAP argues that the "exclusion of Msgrs. [sic] Alavi and Naphin as witnesses, as well as the significant restriction on the testimony of Ms. Blaza and Mr. Kaltenbach, seriously harmed ICAP. Indeed, these witnesses had intimate, personal and exclusive knowledge of various facts that supported ICAP's defenses." (Id.). ICAP further argues that:

> [T]here were issues on which these witnesses were the sole ICAP "authority." For example, Mr. Alavi and Mr. Naphin could personally speak to the specific reasons for the revenue increases on their desks; Ms. Blaza could address details of the

---

three days were needed. The Panel determined that four days would be scheduled, with three consecutive days being allotted and fourth reserved just in case it was needed." (Resp. Br., ECF No. 7-5, at 5, ¶ 8). While Drennan cites to Exhibit K of Ms. Amalfe's Certification for this proposition, Exhibit K does not reflect any such discussion of three days being allotted with the fourth reserved. In fact, Exhibit K specifically notes that the NFA scheduled the arbitration for four days. (Amalfe Cert., Ex. K, ECF No. 2-6, at 5).

> Profit and Loss statements and calculations; and Mr. Kaltenbach could discuss his personal negotiations with Drennan and his counsel, ICAP policies and procedures, and the various expenses for which Drennan claimed reimbursement.

(Id.).

Drennan argues that the Panel was "well within their discretion and autonomy" in prohibiting Messrs. Alavi and Naphin from testifying "because it recognized, after ICAP's counsel's proffer, that these witnesses would not have presented factual testimony but irrelevant opinion testimony as to a subordinate's assessment of a supervisor's performance, which would have neither basis, foundation, nor documentation." (Resp. Br., ECF No. 7-5, at 20). Drennan further argues that "contrary to its assertions, ICAP was not prevented from presenting relevant and material testimony, but was simply constrained in efforts to present it over and over again." (Id. at 20-21).

What Drennan appears to overlook, however, is the substance of the testimony that was either precluded or limited as a result of the proffer. While several cases noted above indicate that courts have declined to vacate arbitration awards where the arbitrators have declined to consider irrelevant evidence, such is not the case with relevant evidence. Compare Century Indem. Co, 584 F.3d at 559-60 (concluding that "the District Court properly denied Century's motion to vacate the arbitration award under 9 U.S.C. § 10(a)(3)" because the "arbitrators' decision to exclude evidence Century proffered based on the evidence's irrelevance was well within their authority in conducting the arbitration") (emphasis added), with Konkar Mar. Enters., 668 F. Supp. at 271 (finding parties to an arbitration "must be allowed to present evidence without unreasonable restriction . . . and must be allowed to confront and cross-examine witnesses . . . Where a party to an arbitration does not receive a full and fair hearing on the merits, a district court will not hesitate to vacate the award") (internal citations omitted).

16

To the contrary, as noted above, an arbitration award may be vacated if "the arbitrator's refusal to hear proffered testimony so affects the rights of a party that it may be said that he was deprived of a fair hearing.  Moreover, it has become axiomatic that a district court may vacate an award if a party to an arbitration proceeding has not been given notice and opportunity to present arguments and evidence on the merits of the dispute."  Teamsters Local 312, 118 F.3d at 995 (internal quotations omitted); see also Gulf Coast Indus. Workers Union v. Exxon Co., USA, 70 F.3d 847, 850 (5th Cir. 1995) (finding failure to consider relevant evidence constituted grounds for vactur).  "[A]lthough not required to hear all the evidence proffered by a party, an arbitrator 'must give each of the parties to the dispute an adequate opportunity to present its evidence and argument.'"  Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997).  This Court finds that the arbitrators did not provide ICAP with an adequate opportunity to present its evidence, not only because they prohibited key witnesses from testifying and limited the testimony of other witnesses, but also because the process by which they reached their decision to do so was itself remarkably unfair.

Drennan testified on direct examination during the first day and part of the morning on the second day of the Hearing.  Before ICAP finished cross-examining Drennan, the Panel requested that ICAP's counsel provide an offer of proof as to at least five of ICAP's seven witnesses.[6] (Amalfe Cert., ECF No. 1-2, ¶ 33).  ICAP's counsel was not prepared to present a complete proffer

---

[6] While the Panel did not request a proffer as to Mr. Pettit, it is not clear from the parties' submissions whether a formal proffer was made as to Mr. Smith.  (Compare Amalfe Cert., Ex. B, ECF No. 2-3, 489:4-7) ("Ms. Amalfe, you mentioned before the lunch break that there's seven witnesses. We'd like an offer of proof on all of the witnesses except Gary Pettit") (and Amalfe Cert., ECF No. 1-2, ¶ 33) ("[T]he Panel unilaterally requested from ICAP an offer of proof as to seven of the eight witnesses it intended to call on its case- in-chief"), (with Resp. Br., ECF No. 7-5, at 6, ¶ 11) (citing Pet. to Confirm, Ex. 6, ECF No. 7-4, at 9 n.3) ("All of these witnesses testified at the hearing, Smith and Pettit without any need of proffer)."  While the discrepancy does not impact this Court's analysis, this Court, nevertheless, notes it for the sake of clarity.

as to each of its witnesses, as she was in the midst of cross examination "and did not have [her] notes or examination outlines for all of those witnesses in the hearing room and available . . . to refer to." (Id. ¶ 34). Although ICAP's counsel requested that the Panel provide her with "additional time to present a complete proffer for each of ICAP's witnesses", the Panel denied that modest request, insisting that she provide the proffer immediately. (Id. ¶ 35). Nevertheless, ICAP's counsel proceeded to provide the offer of proof to the Panel, with the limited information she had.

After counsel completed the proffer, the Panel precluded both Sep Alavi and Bill Naphin from testifying.

> CHAIRMAN NASTRO: On the two brokers, we don't think that it's necessary to have these brokers **based on the conversations that we've had**. We are looking at a management issue, a management case between a manager and his superior, and those are the parties that have to address all the issues surrounding the performance or nonperformance of the individual in question, so we do not wish those people to be witnesses.

(Amalfe Cert., Ex. B, ECF No. 2-3, 533:13-21) (emphasis added). The arbitrators made this determination "based on the conversations" had, despite the fact that ICAP's counsel was required to provide a proffer without forewarning, without additional time to prepare, and without the benefit of her notes. Drennan argues that ICAP was "given every opportunity to make proffers of evidence in an effort to convince the Panel of the need for additional days and witnesses – it was ICAP that could not convince the Panel of the relevance or materiality of such evidence." (Resp. Br., ECF No. 7-5, at 3, ¶ 3(ii)). This Court notes, first, that the proffer was not made in hope of being granted additional Hearing days or allowing additional witnesses to testify; rather, it was made in response to the Panel's demand and with regard to witnesses that ICAP had identified for testimony well in advance of the Hearing. Second, Drennan does not clarify how ICAP had every

opportunity to make a proffer.   In fact, the record demonstrates it had just one inadequate opportunity.

Drennan also argues that ICAP advised the NFA in its brief in opposition to Drennan's motion for emergent relief concerning the hearing plan, that "Richard Kaltenbach, Esq., Gary Smith and Gary Pettit were ICAP's 'necessary witnesses,' . . . [and] the late April hearing date was selected in large part because ICAP's counsel represented that Smith and Pettit would be available at that time. (All of these witnesses testified at the hearing, Smith and Pettit without any need of proffer)." (Resp. Br., ECF No. 7-5, at 6, ¶ 11) (citing Pet. to Confirm, Ex. 6, ECF No. 7-4, at 9 n.3).   Drennan apparently suggests that these three witnesses were ICAP's only necessary witnesses, and notes that the Panel permitted each of them to testify.   A closer reading of the record, however, reveals that ICAP referenced these three witnesses merely in the context of scheduling.   Specifically, ICAP stated, "several of the key witnesses in this case reside and work in Europe and several already have vacation and travel plans." (Pet. to Confirm, Ex. 6, ECF No. 7-4, at 9).   ICAP then set forth three examples of Mr. Kaltenbach, Mr. Smith, and Mr. Pettit's schedules, indicating that each is a "necessary witness", but never once indicating that they were ICAP's only necessary witnesses. (Pet. to Confirm, Ex. 6, ECF No. 7-4, at 9 n.3).

Had the Panel provided ICAP's counsel with advance notice that a proffer would be necessary, given ICAP's counsel some time to prepare, or simply allowed counsel to obtain her notes regarding the witnesses in question so that she could make a meaningful proffer, perhaps its decision to exclude ICAP's witnesses would not be so prejudicial.   Consequently, this Court's determination is not based solely on the fact that the Panel excluded certain witnesses and limited others.   But rather, this Court also finds that the way in which the Panel reached their decision was a result of an unfair proffer and process.   The arbitrators deemed the testimony of ICAP's witnesses

unnecessary based on a procedurally flawed and prejudicial situation that the arbitrators themselves created, and without the information necessary to fairly evaluate ICAP's proposed witnesses. Perhaps most troubling is the fact that, though ICAP's counsel asked for an opportunity to review her records to obtain that information, the Panel did not want it. (See Amalfe Cert., ECF No. 1-2, ¶ 34). Had the Panel reviewed all of the information and allowed ICAP's counsel to make a full and complete proffer and then, at that time, determined that the testimony of certain witnesses would either be precluded or limited, then perhaps this Court's recommendation would be different. It is impossible to determine whether the Panel's ultimate decision to exclude certain witnesses and limit the testimony of others was rationally based, given the fact that Drennan's cross-examination was not yet complete, the flawed proffer, and the Panel directing ICAP's counsel as to which of its witnesses should testify to which facts.[7] Improperly excluded relevant evidence undermines any claim of rational decision making.

---

[7] For example, during the proffer, the Panel questioned ICAP as to Ms. Blaza's testimony:

> CHAIRMAN NASTRO: Okay. So her testimony would be specifically on that document.
>
> MS. AMALFE: It's --
>
> CHAIRMAN NASTRO: And what else?
>
> MS. AMALFE: All of the issues relating to finance. I don't have the outline in front of me, but the indicators for how the business was progressing. He's calculating 24 million --
>
> CHAIRMAN NASTRO: Well, Gary Pettit and Smith can testify to that.

(Amalfe Cert., Ex. B, ECF No. 2-3, 489:25-490:9). In fact, ICAP's counsel ultimately certified that "no other witness could have testified regarding ICAP's financial records and the actual and specific results of the U.S. Futures Desk during Drennan's tenure and no other witness could have testified about her personal conversation with Drennan about these very issues." (Amalfe Cert., ECF No. 1-2, ¶ 42).

Drennan argues that the proffer did not "come out of nowhere as suggested in the motion to vacate", but rather "[i]t was when ICAP's counsel raised her request for additional hearing days with the Panel . . . that the Panel reasonably asked her for a proffer." (Resp. Br., ECF No. 7-5, at 8, ¶ 13) (citing Amalfe Cert., Ex. B, ECF No. 2-3, 488:9-536:6). A reading of the transcript does not, however, support Drennan's assertion. The transcript reflects that during ICAP's cross-examination of Drennan, the following exchange took place:

> MS. AMALFE: I'm going to go to a new topic. Do you want me to break now for lunch, or do you want me to start the new topic and break a little later?
>
> CHAIRMAN NASTRO: We'll break now for 45 minutes, but let me get an idea how long you will be.
>
> MS. AMALFE: All day.
>
> CHAIRMAN NASTRO: The rest of the day? Will you finish?
>
> MS. AMALFE: I don't know.
>
> CHAIRMAN NASTRO: Okay.
>
> MS. OSHINS: I have a question. I know you submitted a hearing plan, but could you outline briefly what the plan is for Thursday and Friday?
>
> THE REPORTER: Do you want to go off the record?
>
> MS. OSHINS: Yeah, go off.
>
> (Thereupon, lunch recess was taken.)
>
> CHAIRMAN NASTRO: Ms. Amalfe, you mentioned before the lunch break that there's seven witnesses. We'd like an offer of proof on all of the witnesses except Gary Pettit.

(Amalfe Cert., Ex. B, ECF No. 2-3, 488:9-489:7). It is clear that the Panel's request for an offer of proof came after the Panel inquired into how long ICAP intended to cross-examine Drennan and after Arbitrator Oshins' request for a brief outline of the days to come. Considered in light of

the Panel's later instruction to have Mr. Pettit available on day three rather than day four, it appears that the Panel did not intend to sit for a four day hearing.

The Panel limited Ms. Blaza and Mr. Kaltenbach in their testimony and precluded Messrs. Alvi and Naphin from testifying entirely. ICAP's counsel's certification provides a detailed list of the topics to which each of these witnesses would have testified. (Amalfe Cert., ECF No. 1-2, at 12-14, 17). As to Ms. Blaza, ICAP argues that she "was precluded from testifying about the specific financial errors and misrepresentations in Drennan's quarterly reports, the financial errors in his month-over-month revenue calculations which supported his substantial damages calculations, the data in the ICAP management reports that would have directly contradicted Drennan's assumptions, and the ICAP budgets that set out a proposed salary and bonus for Drennan". (Pet. Rep. Br., ECF No. 8, at 6) (internal citations omitted). Drennan, on the other hand, "testified at length regarding these issues." (Id.). Ms. Blaza was also "prepared to testify about her efforts to work with management to provide a good faith offer to Drennan for his Year 2 bonus." (Amalfe Cert., ECF No. 1-2, ¶ 42).

Furthermore, the Panel so limited Mr. Kaltenbach's testimony that it lasted only approximately 14 minutes. (See Supp. Amalfe Cert., ECF No. 8-1, ¶ 3).

> Mr. Kaltenbach would have testified in detail about the negotiation and terms of the Employment Agreement and discussions directly with Drennan and his counsel about the contract. **He would have directly challenged the testimony that Drennan reasonably relied on alleged statements or promises made prior to the execution of the Agreement based on his own personal discussions and negotiations with Drennan and his counsel.** He was the ICAP witness who would have presented ICAP's rebuttal to Drennan's claims on "a quasi contract and reliance basis." Mr. Kaltenbach was also the ICAP witness who would have testified about the "contractually due reimbursements and payments" that Drennan alleges constitute nearly one-third of the total amount of the Award.

(Pet. Rep. Br., ECF No. 8, at 7) (emphasis added).  ICAP stresses that Mr. Kaltenbach "was the

only person who could have testified in rebuttal to Drennan's testimony on these issues".  (Id.)

(emphasis added).

The Panel allowed Mr. Kaltenbach to discuss "the contractual justification for why ICAP

did not reimburse Drennan for his repatriation expenses, the timeliness of ICAP's payment to

Drennan of medical benefits, and reimbursement for a home leave flight for Drennan's wife."

(Amalfe Cert., ECF No. 1-2, ¶ 44).

> Mr. Kaltenbach was prepared to testify to a number of issues including (1) the
> negotiation and actual terms of Drennan's Employment Agreement, including the
> language contained in the Employment Agreement regarding the discretionary
> incentive bonus and the good faith negotiations required for Year 2, (2) numerous
> discussions directly with Drennan about his employment contract and its terms, (3)
> ICAP's Year 2 good faith bonus compensation proposal to Drennan and negotiation
> of same, (4) whether ICAP had at any time agreed to a guaranteed minimum bonus
> for Year 2 as stated by Drennan on direct (5) discussions directly with Drennan's
> counsel on issues of compensation and contractual terms, and (6) a salary
> overpayment to Drennan.
>
> He was also going to explain the decision to put Drennan on "garden- leave" after
> his resignation, the way ICAP employees are compensated while on garden-leave,
> and why Drennan was not paid certain costs and expenses relating to tax
> preparation. Mr. Kaltenbach was also the ICAP witness who would have spoken to
> Drennan's breach of the Confidentiality Policy in ICAP's Employee Handbook and
> in Drennan's Employment Agreement, a fact which ICAP learned after Drennan's
> resignation.

(Id. ¶¶ 45, 46).  The Panel, however, thought it "inappropriate to have [Mr. Kaltenbach] as a

witness simply because the contract speaks for itself." (Amalfe Cert., Ex. B, ECF No. 2-3, 533:23-

24).  Chairman Nastro further explained, "what I want to hear is Mr. Smith and Mr. Pettit who

negotiated the contract, not the attorneys who were simply scriveners, and it's inappropriate to

have them discuss the contract.  It's more appropriate to discuss what everyone understood the

contract said. And when I say 'Everyone,' I mean the managers simply." (Id. 534:2-8).  ICAP

argues that as a result of "the Panel's arbitrary and capricious ruling, ICAP's side of the story was

never heard" and ICAP's "rebuttal evidence was never presented" and, therefore, "Drennan's factual asserts went un-rebutted". (Pet. Rep. Br., ECF No. 8, at 5, 8) (emphasis removed).

Finally, ICAP notes that Messrs. Alavi and Naphin would have testified that Drennan's testimony regarding his "purported performance-related success while at ICAP" was "completely untruthful". (Id.). According to ICAP, both of these witnesses "would have directly rebutted Drennan's claimed financial projections for the business at issue and Drennan's contention that he could not entice hedge funds to work with ICAP. They would have testified that they were already doing business with hedge funds and having no difficulty whatsoever with that business." (Id.). It appears as though ICAP valued the testimony of Messrs. Alavi and Naphin because "[t]heir testimony would have eviscerated Drennan's claim during his case-in-chief that **he** created growth and that the growth would have continued at an extraordinary rate into the second half of 2013." (Id.). As a result of the Panel's ruling, however, ICAP never had an opportunity to present evidence on those issues. (Id.).

Furthermore, Drennan does not argue that any of ICAP's other witnesses testified to any of the precluded material noted above. (See Resp. Br., ECF No. 7-5). The Court has conducted an extensive review of the parties' submissions and notes that it appears that none of ICAP's other witnesses testified regarding the topics that it intended its precluded witnesses, Messrs. Alavi and Naphin, to address. Additionally, no other witnesses testified regarding the information that the Panel precluded Ms. Blaza and Mr. Kaltenbach from testifying to. In fact, ICAP notes that Drennan's closing brief specifically references several claims that ICAP failed to rebut during the Hearing. (Amalfe Cert., ECF No. 1-2, at 17) (citing Amalfe Cert., ECF No. 2-9, Ex. V). For example, Drennan makes the following arguments in his closing brief:

> The baseless argument that Drennan was overpaid by one week contradicted by their own document **and was never raised after ICAP's opening by any ICAP**

**witness**. (Amalfe Cert., ECF No. 2-9, Ex. V, at 17) (emphasis removed, emphasis added).

The factually meritless argument that Drennan's sending emails to his wife's email account would have resulted in his termination. Though this argument pre-occupied much of discovery, constituted a major portion of the cross-examination of Mr. Drennan, it amounted to a complete waste of time since **no ICAP witness testified** that ICAP considered such actions to have been breaches of his contract or would have resulted in his termination. (Id.) (emphasis added).

**The unrebutted claim** for reimbursement of tax-related expenses. Drennan testified without rebuttal to tax-related expenses to which he was entitled reimbursement under his agreement. (Id. at 18) (emphasis removed).

**The undisputed notion** that Drennan had a guaranteed minimum bonus ["GMB"] of $200,000 for 2013, yet was paid only $50,000 of that. Drennan is owed $150,000 in GMB from ICAP. Every witness who testified on that subject agreed that the 2013 GMB was to be $200,000 and no one contradicted the assertion that Drennan was only paid $50,000 of that. The GMB is separate and distinct to the incentive bonus due." (Id.) (emphasis removed).

ICAP argues, however, that each of these statements were unrebutted because the Panel prevented both Mr. Kaltenbach and Ms. Blaza from offering relevant testimony. (See Amalfe Cert., ECF No. 1-2, at 17).

The question then becomes, whether this evidence was in fact material to the case at bar. First, this Court notes that Drennan, in his closing brief, used to his advantage the fact that the testimony above went unrebutted. Specifically, he argued that "ICAP has offered no defense to certain elements of Drennan's claim". (Amalfe Cert., ECF No. 2-9, Ex. V, at 17). He then went on to list several arguments, including but not limited to those listed above, which are unrebutted and "total no less than $240,500" in "undisputed amounts ICAP owes Drennan on non-incentive based claims." (Id. at 18, 60). Not only does it appear that Drennan considered this unrebutted testimony vital to his claim for damages, but the testimony that the Panel precluded Messrs. Alavi, Naphin, Kaltenbach, and Ms. Blaza from giving would have directly supported ICAP's theory of the case, and therefore, its defense.

This Court does not base its recommendation on the fact that ICAP's counsel was overruled and interrupted significantly more than Drennan's counsel, (Amalfe Cert., ECF No. 1-2, ¶¶ 20-22), or that the Panel displayed a general disinterest in the proceedings. (Id. ¶¶ 60, 62, 63). Rather, this Court's recommendation hinges on the fact that ICAP's opportunity to present its case was stripped away when the arbitrators refused "to hear evidence pertinent and material to the controversy", 9 U.S.C. § 10(a)(3), together with the procedural flaws discussed above. As a result, this Court finds that ICAP was deprived of a fair hearing.

It is patently unfair to preclude testimony intended to rebut key evidence.  9 U.S.C. § 10(a)(3) provides that a Court may vacate an arbitration award "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy[,] or of any other misbehavior by which the rights of the party have been prejudiced", which is precisely what the arbitrators in this case have done.  In light of the Panel's misconduct, this Court recommends that the award be vacated pursuant to Section 10(a)(3).

Because of this Court's recommendation, this Court need not address whether the award should be vacated under 9 U.S.C. § 10(a)(4).  (See Pet. Br., ECF No. 2-1, at 27).

### c.   Attorneys' Fees

Drennan argues that he should be "awarded attorneys' fees in defending this matter since ICAP did not have a basis to seek vacatur of the [a]ward in this matter."  As Drennan notes, however, the "award of costs and attorneys' fees . . . is a matter committed to the district court's discretion." (Resp. Br., ECF No. 7-5, at 22) (quoting Kane Gas Light & Heating Co. v. Int'l Bhd. of Firemen & Oilers, Local 112, 687 F.2d 673 (3d Cir. 1982)).  In light of its recommendation that the District Court vacate the Panel's award, and in its discretion, this Court declines to recommend an award of attorney fees.

## IV.    CONCLUSION

For the foregoing reasons this Court respectfully recommends that ICAP's Motion to Vacate the Arbitration Award, (ECF No. 2), be **GRANTED** and Drennan's Cross Motion to Confirm the Arbitration Award, (ECF No. 7), be **DENIED.**

JOSEPH A. DICKSON, U.S.M.J.

cc:    Hon. Jose L. Linares U.S.D.J.

27